UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
MS & BP, LLC,

        Plaintiff,

        -- against --

BIG APPLE PETROLEUM, LLC,

        Defendant.
----------------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM AND ORDER**

14-CV-5675 (RRM) (RER)

        Plaintiff, MS & BP, LLC ("MS & BP") brings this action, against defendant Big Apple Petroleum, LLC ("Big Apple"), seeking legal and equitable relief for alleged violations of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* (the "PMPA"), breach of contract, and for other violations under New York state law.[1] MS & BP seeks, *inter alia*, a permanent and preliminary injunction: (i) enjoining Big Apple from terminating the fuel supply and station lease agreements between them; (ii) ordering Big Apple to engage in good faith negotiation for renewal of the agreements; and (iii) ordering Big Apple to renew the agreements, including a reduction in rent and fuel price. With the consent of Big Apple, a temporary restraining order has remained in place since the removal of this action from state court, temporarily enjoining Big Apple from terminating or failing to renew the Supply Agreement and Lease. For the reasons stated herein, MS & BP's request for a preliminary injunction is hereby DENIED.

---

[1] Big Apple removed this action from the Supreme Court of the State of New York, County of Queens, on September 29, 2014. On October 10, 2014, MS & BP filed a new complaint before this Court.

# FACTUAL BACKGROUND[2]

## I.     The Supply Agreement and Lease

Big Apple is an Exxon/Mobil fuel distributor, and currently owns a service station located at 112-01 Beach Channel Drive, Rockaway Park, New York.  (Decl. of Walton E. Bell, Oct. 16, 2014 ["Bell Decl."] (Doc. No. 8.) at ¶ 4.)  In or around 2005, MS & BP, a gas station operator, executed both a supply and lease agreement with Exxon/Mobil, paying $750,000 for the exclusive rights to operate a gas station at that location.  (Compl. (Doc. No. 7) at ¶ 7.)  The supply and lease agreements were renewed in 2008, and in August and September of 2011, respectively.  (Compl. at ¶ 8.)  The 2011 renewals, titled Contract of Sale (Branded) ("Supply Agreement") and the Station Lease (Branded) ("Lease"), were signed by MS & BP and East River Petroleum Realty, LLC, which then assigned its rights as franchisor under the agreement to Big Apple.  (Compl. at ¶ 9; Supply Agreement (Doc. No. 8-2); Lease (Doc. No. 8-3).)  Both the operative Supply Agreement and Lease, by their terms, became effective on October 1, 2011 and were scheduled to expire on September 30, 2014.  (Supply Agreement at ¶ 1(a); Lease at ¶ 2.)  Both contain a cross-termination clause stating, in pertinent part, that the agreement will terminate or not be renewed if, for any lawful reason, the other agreement is terminated or not renewed.  (Supply Agreement at ¶ 24; Lease at ¶ 17(b).)

## II.     Fuel Supply and Billing Practices

Big Apple's affiliated company and wholesaler, Capitol Petroleum Group ("CPG"), hauls fuel and bills MS & BP on behalf of Big Apple.  (*See* Decl. of Brian Griffith, Dec. 8, 2014 ["Griffith Decl."] (Doc. No. 18-2) at ¶ 5.)  According Victor Iroh, a Sales Manager for CPG, there are three ways in which a gas station receives and pays for gasoline from a supplier.

---

[2] The facts, drawn from the complaint, declarations, relevant agreements, correspondence between the parties, and other exhibits made part of the record are undisputed unless otherwise noted.

(Supplemental Decl. of Victor Iroh, Dec. 8, 2014 ["Supplemental Iroh Decl."] (Doc. No. 18-1) at ¶ 3.)

The first method is called "automatic delivery." (*Id.*) With automatic delivery, the fuel hauler manages the dealer's inventory, typically via electronic tank monitoring systems, and delivers fuel before the dealer runs out of inventory. (*Id.*) For automatic deliveries, CPG requires dealers to make payments via Electronic Funds Transfer ("EFT"), an automated direct debit system through which the dealer has authorized CPG to initiate funds transfers. (*Id.* at ¶ 4.)

Both the Supply Agreement and Lease permit Big Apple to require EFT. (Supply Agreement at ¶ 4(a); Lease at ¶ 4(a).) The agreements both specify that where, as here, a seller or lessor requires payment via EFT, the purchaser or lessee must establish a dedicated commercial account with a financial institution that provides such services, authorize the seller or lessor to initiate transfers of funds from the account for all sums due under the contract for the duration of the entire term of the contract, and "maintain at all times funds in its account sufficient to make payments . . . at the time of the EFT transaction." (Supply Agreement at ¶ 4(b); Lease at ¶ 3(b).) According to Iroh, CPG's consistent business practice, and the one in place throughout its relationship with MS & BP, was to initiate EFTs on the third business day following a fuel delivery made via automatic delivery. (Supplemental Iroh Decl. at ¶ 5.)

The Supply Agreement and Lease also permit Big Apple to collect "a service charge for each occurrence of such rejection," by the financial institution, "whether or not payment is subsequently paid." (Supply Agreement at ¶ 4(b); Lease at ¶ 3(b).) When an EFT bounced for insufficient funds, CPG would charge MS & BP a $175 fee. (*See* Griffith Decl. at ¶¶ 7, 8, 9, 10, 11, 13.) CPG also requires all of its dealers to pay for rent under applicable station leases via EFT. (Griffith Decl. at ¶ 4.)

Purchases made at the station by consumers and paid for other than in cash – called "cash-less" payments – are also used for payments through EFT.[3]   According to Brian Griffith, an Assistant Sales Manager for CPG, all cash-less purchases made at the station were processed by Exxon/Mobil and subsequently transmitted to CPG. (Griffith Decl. at ¶ 5; Decl. of Brian Griffith, Feb. 23, 2015 ["Supplemental Griffith Decl."] (Doc. No. 25) at ¶ 4.)  Griffith represented that neither CPG, nor any of its affiliates, exercise any control over the processing of credit or debit card sales.  (Supplemental Griffith Decl. at ¶ 4.)  However, as soon as those sales are processed and remitted to CPG, they are reflected in the station's account balance. (Supplemental Griffith Decl. at ¶ 5.)  Once the station's account balance reflected such cash-less payment receipts, CPG would then initiate an EFT for only the balance of funds due.  (Griffith Decl. at ¶ 5.)  CPG maintains an electronic portal where its retailers can view their account history and balance going back ninety days.  (*Id.*)

The second method by which a gas station receives and pays for gasoline is called "manual delivery."  (Supplemental Iroh Decl. at ¶ 3.)  A dealer on manual delivery orders his own fuel on at least twenty-four hours advance notice to the hauler and pays at the time of delivery.  (*Id.*)  This allows the dealer to manage his own inventory and cash flow.  The third method, called "prepay," requires the dealer to pay in advance for any delivery by the wholesaler.  (*Id.*)

### III.    MS & BP's EFT Bounces and Security Deposit

In October 2012, the station was badly damaged by Hurricane Sandy.  (Compl. at ¶ 12; Decl. of Victor Iroh, Oct. 17, 2014 ["Iroh Decl."] (Doc. No. 8-1) at ¶ 3.)  The station subsequently remained closed for eight months during repairs, reopening in June 2013.  (Iroh

---

[3] Customers can make cash-less purchase by credit card, debit card, or Speedpass, "a 'touchless' payment system that is linked to a customer's existing credit or debit card."  (Supplemental Griffith Decl. at ¶ 4.)

Decl. at ¶ 3.)  Starting on September 6, 2013, CPG recorded repeated EFT bounces.  (*See* Bell

Decl. at ¶ 10; Bounce Invoices Chart (Doc. No. 8-5) (chart prepared by Big Apple listing

bounced invoices).)  In December 2013, CPG placed MS & BP on manual delivery.

(Supplemental Iroh Decl. at ¶ 6.)  After the holidays, CPG returned MS & BP to automatic

delivery.  (*Id.*)

On January 6, 2014, CPG recorded another EFT bounce.[4]  (Def's Supplementary Mem.

of Law (Doc. No. 18-10) at 3 n.7; Bounce Invoices Chart.)  On January 9, 2014, Big Apple sent

MS & BP a letter with the subject line, "Warning – Failure to Comply with Significant Franchise

Provisions."  (Big Apple Jan. 9, 2014 Letter (Doc. No. 23-1).)  The letter cited the January 6,

2014 bounce and another dishonored EFT draft occurring on December 18, 2013 as failures "to

maintain sufficient funds in [MS & BP's] bank account to timely make payments" and warned

that these constituted breaches of provisions of MS & BP's contract with Big Apple which could

"result in adverse repercussion up to and including termination of the franchise."  *Id.*  CPG

recorded additional bounces on January 9, 13,[5] 17, 24, 30 and 31, and February 6, 2014.

---

[4] Determining how CPG defined when it "recorded" a bounce requires some analysis of different documents
provided to the Court by Big Apple.  Specifically, Big Apple provided the Court, without significant explanation,
two separate spreadsheets summarizing certain details related to their account with MS & BP.  The first is a
summary prepared by Big Apple of "bounce invoices."  (Bounce Invoices Chart.)  The second is a more detailed
"account history," summarizing transactions on MS & BP's account between January 2, 2014 and August 28, 2014,
the entries upon which Griffith states were made or kept in the course of regularly conducted business activity.
(Account History (Doc. No. 25-1); Supplemental Griffith Decl. at ¶ 6.)  Big Apple also provided the Court with five
exhibits that it defined as "documentation detailing [the] EFT transaction[s]."  (See Doc. Nos. 18-3–18-7.)  Each of
these exhibits themselves contain several documents, including an "ACH Activity Summary" from M&T Bank,
which identifies a dishonored EFT draft.  The exhibits also contain a "Transaction Analysis" which includes an
invoice number for the dishonored amount plus $175, the last six digits of which correspond to the date on the ACH
Activity Summary.  For each of the transactions for which Big Apple provided exhibits, the last six digits of the
bounce invoice number correspond to the date on the ACH Activity Summary, which the exception invoice number
55061045, for which the date on the ACH Activity Summary is "6/10/2014."  Both the bounce invoice number and
the date appear on the Bounce Invoices Chart, however only the Bounce Invoice Number appears on the Account
History.  The date of the ACH Activity Summary is the date that CPG cites as the date it "recorded" the bounce.
The entries on both spreadsheets also include a reference number corresponding to the attempted draft that bounced.

[5] The January 13, 2014 bounce appears only on the Bounce Invoices Chart.  However, the Bounce Invoice Chart
indicates that it was for draft reference number 128, and the Account Summary indicates that this draft resulted in a
negative account balance for MS & BP.

On January 22, 2014 Big Apple sent MS & BP a letter demanding a $30,000 security deposit. (Big Apple Jan. 22, 2014 Letter (Doc. No. 1-1 at 78).) The letter referenced the January 9, 2014 letter and cited MS & BP's repeated failure to maintain adequate funds in its bank account to make timely EFT payments for fuel and rent.[6] (*Id.*) CPG satisfied this demand by applying a $28,409.84 payment for fuel delivery, which it had already satisfied using cash-less payment receipts, to the security deposit. (Griffith Decl. at ¶¶ 12–17.) No additional funds were ever applied towards the security deposit.[7] (*Id.* at ¶ 16.) On February 6, 2014, CPG placed MS & BP on prepay. (Supplemental Iroh Decl. at ¶ 8.) MS & BP remained exclusively on prepay for fuel until the end of May 2014. (*Id.*) CPG continued to utilize EFT to collect MS & BP's station rent during this time.

On April 30, 2014, CPG received notice that an EFT withdrawal attempt made on April 28, 2014 for $4,370.50 in rent due bounced. (Def.'s Supplementary Mem. of Law, Ex. 1.) MS & BP paid this amount, plus $175, on May 5, 2014. (*Id.*) On May 23, 2014, CPG received notice that an EFT withdrawal attempt made on May 21, 2014 for $4,370.50 in rent due bounced. (*Id.* Ex. 2.) MS & BP paid this amount, plus $175, on June 2, 2014. (*Id.*) On June 10, 2014, with MS & BP having been restored to automatic delivery for fuel since the end of May, CPG received notice that an EFT withdrawal attempt made on June 6, 2014 for $17,087.13 for the

---

[6] The letter specifically referenced a "dishonored draft[] occurring on January, 15, 2014. The amount of the dishonored debit, $28,234.84 appears as entry in the Account Summary on January 14, 2014 and is listed on the Bounce Invoice Summary as (and bears an invoice number referencing) January 17, 2014.

[7] On February 5, 2014, MS & BP e-mailed CPG two images purporting to show transfers for both the $28,409.84 payment and the $30,000 security deposit. (Def.'s Supplementary Mem. of Law, Ex. 6.) According to CPG, the security deposit wire was never received. (Griffith Decl. at ¶ 17.) MS & BP has not alleged that it was double charged for the security deposit and agreed with Big Apple during a Court conference held on February 3, 2015 that the $30,000 wire was never completed.

balance owed on a fuel delivery bounced.  (*Id.* Ex. 3; Griffith Decl. at ¶ 9.)  MS & BP paid this

amount, plus $175, on June 20, 2014.[8]

On June 17, 2014, following notification that the June 6, 2014 EFT attempt had bounced,

Big Apple issued and served a notice of termination to MS & BP, indicating that it would

terminate the franchise effective September 15, 2014.  (Big Apple June 17, 2014 Letter (Doc.

No. 1-1 at 80).)  The termination letter stated that the grounds for termination were:

> (i) [MS& BP]'s failure to pay [Big Apple] in a timely manner when due all sums
> to which [Big Apple] is legally entitled; 15 U.S.C. §2802(b)(2)(C) and
> §2802(c)(8); and (ii) [MS & BP]'s failure to comply with any provision of the
> franchise, which provision is both reasonable and of material significance to the
> franchise relationship, 15 U.S.C. § 2802(b)(2)(A).

(*Id.*)  The letter continued:

> Specifically, [MS & BP] has repeatedly failed to pay unto [Big Apple] in a timely
> manner all sums due and owing for branded motor fuel purchased under the
> [Supply Agreement] and for rent under the [Lease].  That is, [MS & BP] has
> repeatedly failed to maintain sufficient funds in its bank account to timely pay for
> motor fuel product ad [sic] rent via EFT.  The foregoing constitutes breaches of
> provisions of the [Supply Agreement] and the [Lease] that are both reasonable
> and of material significance to the franchise relationship.

(*Id.*)

## LEGAL STANDARDS

The PMPA was enacted in 1978, in part to address the disparity of bargaining power that

existed between gasoline franchisors and franchisees and the resulting "vulnerability of the

franchisee to the demands and actions of the franchisor."  S. Rep. No. 95-731, at 17 (1978).  A

"franchise," as defined by the PMPA, is:

> any contract between a refiner and distributor, a refiner and retailer, a distributer
> and another distributor, or a distributor and retailer under which the refiner or
> distributor . . . authorizes or permits a retailer or distributor to use, in connection
> with the sale, consignment, or distribution of motor fuel, a trademark which is

---

[8] Two additional EFT withdrawal attempts, made on June 23, 2014 and August 7, 2014 also bounced.  (Def.'s
Supplementary Mem. of Law Ex. 4, 5.)  As both of these bounces post-date the notice of termination, they do not
bear on the validity of the reasons for termination provided in the notice of termination.

owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

15 U.S.C. § 2801(1)(A). This includes any lease of premises controlled by the distributor for the purpose of sale of motor fuel. *Id.* § 2801(1)(B), (9).

## I.    Termination or Nonrenewal Under the PMPA

In keeping with its legislative purpose, the PMPA contains a general prohibition against termination of a franchise or nonrenewal of a franchise relationship by a franchisor, except upon specified preconditions and grounds. *Id.* § 2802(a). Those preconditions and grounds are specified in section 2802(b). Section 2802(b)(1) provides:

(1) Any franchisor may terminate any franchise . . . or may fail to renew a franchise relationship if:
(A) the notification requirements of section 2804 of this title are met; and
(B) such termination is based upon a ground described in paragraph (2) or such nonrenewal is based upon a ground described in paragraph (2) or (3).

Section 2804 specifies both the time frame and manner of notification required. Subsection (c) dictates that notification:

(1) shall be in writing;
(2) shall be posted by certified mail or personally delivered to the franchisee; and
(3) shall contain--
(A) a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor;
(B) the date on which such termination or nonrenewal takes effect; and
(C) the summary statement prepared under subsection (d) of this section.

Generally, a franchisor must furnish notice of termination "not less than 90 days prior to the date on which such termination or nonrenewal takes effect." *Id.* § 2804(a). However, subsection (b) permits less than 90 days notice "[i]n circumstances in which it would not be reasonable" for the franchisor to furnish such notification, in which case a "franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable." *Id.* § 2804(b)(1).

Relevant to the present case are the following grounds for termination under section 2802(b)(2)(A) and (b)(2)(C):

> (A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure--
>> (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or
>> (ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.
>> . . .
> (C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence--
>> (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title;
>> (ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

Section 2802(c) goes on to define "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable," as used in section 2802(b)(2)(C), to include twelve enumerated events. Although the list is intended to be nonexclusive, the Second Circuit conclusively presumes termination predicated upon the occurrence of one of the events enumerated in section 2802(c) to be reasonable as a matter of law. *Russo v. Texaco, Inc.*, 808 F.2d 221, 225 (2d Cir. 1986). "Once having ascertained that an event is encompassed by one of the twelve enumerated events, a court need make no further inquiry as to the reasonableness of the termination." *Id.*

Most important of these enumerated events, for purposes of the present case, is section 2802(c)(8), which is "failure by the franchisee to pay the franchisor in a timely manner when due

all sums to which the franchisor is legally entitled." The PMPA does not define "timely" as used in section 2802(c)(8), nor has the Second Circuit. However, courts in other circuits have concluded that the question of whether payments were timely should be evaluated, "in view of prevailing commercial or industry trade practices." *See Joseph v. Sasafrasnet, LLC*, 689 F.3d 683, 693 (7th Cir. 2012); *Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1573 (11th Cir. 1987) (citing S. Rep. No. 95-731, at 38 (1978)).[9] A franchisor placing a franchisee on prepay status in response to repeated late payments or imposing a monetary penalty for subsequent late payments might put a franchisee on notice that the franchisor is not in the practice of permitting late payments and could constitute some evidence of industry trade practice. *Sasafrasnet*, 689 F.3d at 693.

The permissiveness of termination or nonrenewal under section 2802(b) is an affirmative defense. *Ceraso v. Motiva Enterprises, LLC*, 326 F.3d 303, 316 (2d Cir. 2003); 15 U.S.C. § 2805. Accordingly, the franchisor bears the burden of proving that its action was permitted by the PMPA. 326 F.3d at 316; 15 U.S.C. § 2805.

## II.     Timing of Notice of Violations to Franchisor

As noted above, both 2802(b)(2)(A) and 2802(b)(2)(C) require that a franchisor seeking to terminate or not renew a franchise agreement have actual or constructive notice of the event giving rise to the termination or nonrenewal within 120 days prior to the date that notice of termination is furnished (or 60 days if the notice of termination provides less than 90 days

---

[9] Consistent with the view that the PMPA's terms incorporate prevailing trade practices, the Third Circuit has opined that a franchisor's repeated acceptance of late payment over a period of years might "suggest that timely payment was not its prevailing trade practice." *See Sun Refining and Mktg. Co. v. Rago*, 741 F.2d 670, 673, 674 (3d Cir. 1984) (clarified in *Patel v. Sun Co., Inc.*, 141 F.3d 447, 457–58 (3d Cir. 1998)). The Third Circuit, unlike the Second Circuit, however, did so in the context of declining to adopt a presumption of reasonableness for termination or nonrenewal following the occurrence of one of the enumerated section 2802(c) events. *See id.*

advance notice, a condition not relevant to the present case).[10] This is to prevent a franchisor "from using stale events or violations to which it has acquiesced as later grounds for termination of the franchise." *California Petroleum Distributors Inc. v. Chevron U.S.A. Inc.*, 589 F. Supp. 282, 287 (E.D.N.Y. 1984). However, courts in this circuit have adopted a theory of "continuing non-compliance" so as not to punish franchisors who, upon first obtaining knowledge of non-compliance, attempt to resolve the non-compliance without resorting to termination. *Id.* at 288. The Second Circuit has rejected the argument that a franchisor must not have had knowledge of an ongoing violation before the 120-day period began. *Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54, 59–60 (2d Cir. 1984). Similarly, where a sum due is outstanding both before and after the 120 day limit, an untimely payment may be viewed as an "ongoing violation," and each refusal to agree on repayment terms may constitute a separate violation. 589 F. Supp. at 288.

### III.    Preliminary Injunction Under the PMPA

The PMPA itself sets forth the standard and assigns the burdens that must be met before a court may issue a preliminary injunction under the Act. 15 U.S.C. § 2805(b)(2)–(3). There are three prongs that must be satisfied before a preliminary injunction may be ordered. As to the first and second prong,  "[t]he franchisee [must] show[] -- (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation." *Id.* § 2805(b)(2)(A). The Second Circuit recognizes this burden as "less severe 'than is generally required under Rule 65 [of the Federal Rules of Civil Procedure].'" *Nassau Blvd. Shell Serv. Station, Inc. v. Shell Oil Co.*, 875 F.2d 359, 363 (2d Cir. 1989) (quoting *Ewing v. Amoco Oil Co.*, 823 F.2d 1432, 1436 (10th Cir. 1987)) (alterations in original); *see also Koylum, Inc. v. Peksen Realty Corp.*, 272 F.3d 138, 147 (2d Cir. 2001) (describing burden as

---

[10] It is uncontested in this case that 90 days' notice was given pursuant to section 2804(a).

"lighter . . . than the standard used for a traditional preliminary injunction"). Once a franchisee

has met its burden under the first two prongs, the court must then determine "that, on balance,

the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief

will be less than the hardship which would be imposed upon such franchisee if such preliminary

injunctive relief were not granted."[11] 15 U.S.C. § 2805(b)(2)(B).

## IV.     Preemption of State Laws Under the PMPA

The PMPA contains an express preemption clause that states:

> To the extent that any provision of this subchapter applies to the termination (or
> the furnishing of notification with respect thereto) of any franchise, or to the
> nonrenewal (or the furnishing of notification with respect thereto) of any
> franchise relationship, no State or any political subdivision thereof may adopt,
> enforce, or continue in effect any provision of any law or regulation (including
> any remedy or penalty applicable to any violation thereof) with respect to
> termination (or the furnishing of notification with respect thereto) of any such
> franchise or to the nonrenewal (or the furnishing of notification with respect
> thereto) of any such franchise relationship unless such provision of such law or
> regulation is the same as the applicable provision of this subchapter.

15 U.S.C. § 2806. The Second Circuit made clear that "[t]he PMPA neither expressly nor

impliedly preempts all state law relating to any aspect of the termination or non-renewal of

petroleum franchises," but merely those laws regarding the "grounds for, procedures for, and

notification requirements with respect to termination or non-renewal" of such contracts.

*Bellmore v. Mobil Oil Corp.*, 783 F.2d 300, 304 (2d Cir. 1986) (declining to hold that the PMPA

preempted a Connecticut law requiring fair compensation for "good will" of the franchise upon

termination). Nor does the PMPA preempt breach-of-contract claims that do not involve the

termination of the franchise relationship and are independent of termination claims. *Yonaty v.*

*Amerada Hess Corp.*, 04-CV-605 (FJS) (DEP), 2005 WL 1460411, at *3 (N.D.N.Y. June 20,

---

[11] Here, the Court will assume, without deciding, that hardships imposed upon the franchisor by the issuance of
preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such
preliminary injunctive relief were not granted.

2005).  However, courts have held that where state law claims are "intimately intertwined with the termination or nonrenewal of a franchise," that the PMPA preempts such laws.  *Shukla v. BP Exploration & Oil, Inc.*, 115 F.3d 849, 857 (11th Cir. 1997); *see also Serianni v. Gulf Oil Corp.*, 662 F. Supp. 1020, 1025 (E.D. Pa. 1986).

## DISCUSSION

MS & BP seeks a preliminary injunction enjoining Big Apple from terminating the Supply Agreement and Lease, ordering Big Apple to engage in good faith negotiation for renewal of the agreements, and ordering Big Apple to renew the agreements at a reduced rent and fuel price.  Because MS & BP's request for a preliminary injunction specifically challenges whether Big Apple has adequate grounds to terminate the franchise, the PMPA controls.  *See* 15 U.S.C. § 2806; *Bellmore*, 783 F.2d at 304.

The PMPA provides its own standard for preliminary injunctions based on claims governed by the act.  *See* 15 U.S.C. § 2805(b)(2)(A).  In order to obtain a preliminary injunction under the PMPA, MS & BP must show (i) that the franchise has been terminated or not renewed, and (ii) that "there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation."  15 U.S.C. § 2805(b)(2)(A).  As noted, the Second Circuit recognizes the second prong as a "lighter" burden than that required under Rule 65 of the Federal Rules of Civil Procedure.  *Koylum*, 272 F.3d at 147; *Nassau Blvd. Shell Serv. Station*, 875 F.2d at 363–64.  Big Apple's "notice of termination" easily satisfies the first prong.

Thus, whether this Court will issue a preliminary injunction under section 2805 turns on whether there are sufficiently serious questions going to the merits to make such questions a fair ground for litigation.   In that regard, MS & BP raises the following arguments:

1.  Big Apple never clarified what constituted "late payment" under the Supply Agreement and Lease.  (Pl.'s Supplementary Mem. of Law (Doc. No. 19) at 7–8.)

2. There could be no late payments after the security deposit demand because the security deposit was a buffer against which Big Apple was required to offset any EFT bounces. (Compl. at ¶ 20; Pl.'s Supplementary Mem. of Law at 2–4.)

3. Big Apple's acceptance of untimely payments constituted waiver of the timeliness provisions in the Supply Agreement and Lease. (Compl. at ¶ 23.)

4. Big Apple is responsible for any dishonored EFT withdrawal attempts because of inconsistencies in the amount of time between when cash-less payment receipts were generated at the station and when they were subsequently credited to MS & BP's account. (Pl.'s Second Supplementary Mem. of Law (Doc. No. 26) at 4–6.)

5. Big Apple acted in bad faith, as supported by evidence of collusion between Big Apple and a contractor of MS & BP's to not order gas for a period of seven days, thus providing an opportunity for Big Apple to terminate under 15 U.S.C. § 2802(c)(9). (Compl. at ¶¶ 42–47; Pl.'s Supplementary Mem. of Law at 6.)

On this record, the Court finds that none of these arguments present sufficiently serious questions going to the merits to make such questions a fair ground for litigation. MS & BP repeatedly failed to pay Big Apple in a timely manner when due all sums to which Big Apple was legally entitled. Such failures are clearly relevant to the franchise relationship and provide ample, reasonable ground for termination under 15 U.S.C. 2802(b)(2)(C). *See also id.* § 2802(c); *Russo*, 808 F.2d at 225. Thus, injunctive relief is not warranted.

## I.    Timeliness of Termination Notice

As a threshold matter, Big Apple's notice of termination was timely, having been furnished ninety days prior to September 15, 2015, the date in which termination was to take effect. *See* 15 U.S.C. § 2805(a). A franchisor providing 90 days' notice must have actual or constructive notice of an event giving rise to termination within 120 days prior to the date that it furnishes the notice of termination. *See id.* § 2802(b)(2)(A)(i), (C)(i). Big Apple furnished

notice of termination on June 17, 2014.  Thus, only those events which fall after February 17, 2014 may validly support termination of the franchise.[12]

## II.    Lateness of Payments

Although the PMPA expressly defines "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" to include "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled," it does not further define "timely" payment.  *See id.* § 2802(c); *see also id.* § 2801 (definitions).  MS & BP appears to argue reliance based upon the fact that Big Apple never clarified what constituted a "late payment."[13]  (*See* Pl.'s Supplementary Mem. of Law at 7–8.)

MS & BP's payment obligations are clearly set forth in the Supply Agreement and Lease, however.  The Supply Agreement states, "[p]ayment shall be made at the time of delivery," and requires MS & BP to "maintain at all times funds in its account sufficient to make payments to [Big Apple] at the time of the EFT transaction."  (Supply Agreement at ¶ 4(a), (b).)  The Lease states, "monthly rent shall be payable, without setoff, deduction, notice, or demand, on the fifteenth (15th) day of each and every" month, and also requires MS & BP to "maintain at all times funds in its account sufficient to make payments to [Big Apple] at the time of the EFT transaction."  Big Apple has produced affidavits indicating that it was CPG's uniform practice to initiate EFTs on either the third business day following a fuel delivery made via automatic delivery or for the balance of money owed within three days of when Exxon/Mobil processed

---

[12] Although events older than 120 days prior to notice of termination may not give rise to grounds for termination, Big Apple's prior acceptance of late payments does not waive its right to terminate based upon late payments falling within the 120-day window.  *See Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 376 n.4 (4th Cir. 1992), *as amended* (July 21, 1992).  "The time limitations are not intended to stop a franchisor from exercising termination . . . rights based upon a future event which constitutes a ground for termination . . . , even if such future event is a repeat occurrence of an event with respect to which the previous exercise of termination . . . rights was waived."  *Wisser*, 730 F.2d at 59–60 (quoting S. Rep. No. 95-731, at 34 (1978)).

[13] Both the PMPA and the termination letter refer to the failure to make "timely" payments.

and transmitted MS & BP's cash-less payment receipts to CPG. (*See* Supplemental Iroh Decl. at

¶ 5; Griffith Decl. at ¶ 4.) This also provides some unrefuted evidence of industry trade practice.

*See Sasafrasnet*, 689 F.3d at 693. It is also unrefuted that when CPG processed several EFT

transactions, the transactions bounced for insufficient funds. MS & BP therefore failed to make

timely payments, regardless of whether timeliness is defined based upon the available evidence

of trade practice or the plain language of MS & BP's agreements with Big Apple.

### III.    The Security Deposit

In response to MS & BP's "repeated fail[ure] to maintain sufficient funds in its bank

account to make timely payments by [EFT] . . . as required per Section 3 (b) of the [Lease] and

Section 4 (b) of the [Supply Agreement]" Big Apple demanded a $30,000 security deposit from

MS & BP. (Big Apple Jan. 22, 2014 Letter.) The demand invokes the Supply Agreement,

stating that it:

> provides various rights and remedies to [Big Apple] should [MS & BP]'s
> financial conditions become impaired or unsatisfactory to [Big Apple] during the
> term of the franchise, including but not limited, [Big Apple]'s right to: collect a
> service charge on each debit rejected due to insufficient funds, require cash
> payment for any future delivery of products, *and require a security deposit*, letter
> or credit or other forms of security acceptable to [Big Apple].

(*Id.* (emphasis added).) Although the letter does not identify any specific provisions of the

Supply Agreement that it relies upon, the list of remedies referenced in the letter appears in

paragraph 7(f) of the Supply Agreement. (*Id.*; Supply Agreement at ¶ 7(f).) Paragraph 7(f)

provides such remedies "[i]n order to secure payment of all [MS & BP]'s present and future

indebtedness owed by [MS & BP] to [Big Apple] . . . during the Term of [the Supply

Agreement] including renewal periods or upon its termination or expiration." (Supply

Agreement at ¶ 7(f).) The letter goes on to state that MS & BP "shall be required to pay cash for

any future deliveries of gasoline until such security deposit has been provided." (Big Apple Jan. 22, 2014 Letter.)

MS & BP argues that it could not have made untimely payments because Big Apple was required to offset any untimely payments using this security deposit. However, the Supply Agreement places no such limitations on the use of the security deposit. With respect to method of payment, as noted above, both the Supply Agreement and Lease require MS & BP to "maintain at all times funds in its [commercial EFT] account sufficient to make payments to [Big Apple] at the time of [the] EFT transaction." (Supply Agreement at ¶ 4(a), (b); Lease at ¶ 3(a), (b).) Regardless of the existence of a security deposit, it is undisputed that MS & BP did not maintain, at the time of the EFT transactions and as required by both the Supply Agreement and Lease, sufficient funds at all times to make the payments then due. Whether or not Big Apple *could have* used the security deposit to offset dishonored transactions would not alter this fact.[14]

MS & BP also insists that the security demand letter altered or created new terms between MS & BP and Big Apple. (Pl.'s Supplementary Mem. of Law at 2–3.) However, as noted, the right to collect a security deposit falls squarely within the terms of the Supply Agreement. Contrary to MS & BP's assertion, nowhere in the letter demanding a security deposit is it "clearly stated" that the purpose of the security deposit was "to prevent future EFT

---

[14] Big Apple contends that New York's General Obligations Law would have *prohibited* it from offsetting any money owed by MS & BP against the security deposit, citing *In re Perfection Technical Services Press, Inc.*, 256 N.Y.S.2d 166 (App. Div. 2d Dept. 1965), *aff'd sub nom. Matter of Gen. Assignment for the Benefit of Creditors of Perfection Technical Services Press, Inc.*, 219 N.E.2d 424 (N.Y. 1966). Although such a set off is not required, the Court does not find that such set off would have been prohibited. *Perfection Technical* held that a landlord who comingled a security deposit with his own funds "forfeits his right to avail himself of the deposit for any purpose." *Id.* at 170. However, no such limitation applies to a landlord who did not breach his duty to refrain from comingling a security deposit with his own funds. *See In re Pal-Playwell, Inc.*, 334 F.2d 389, 391–92 (2d Cir. 1964) (describing a landlord's "otherwise clear right" to set off a deposit); *accord Coulston v. Teliscope Productions, Ltd.*, 378 N.Y.S.2d 553, 555 (App. Term. 1st Dept. 1975). However, the mere fact that such a set-off might be available is of no moment here. The PMPA gives a franchisor the right to terminate a franchise where, as here, a franchisee has failed to timely pay for goods and rent, failures that are clearly relevant to the franchise relationship under 15 U.S.C. 2802(b)(2)(C). *See also id.* § 2802(c); *Russo*, 808 F.2d at 225.

bounces with respect to fuel and rent payments by providing a substantial buffer of tens of thousands of dollars." (Pl.'s Supplementary Mem. of Law at 2.) As noted, the letter simply identifies the security deposit as one of the remedies available to it "to secure payment of all [MS & BP]'s present and future indebtedness."[15] (Big Apple Jan. 22, 2014 Letter.)

## IV. Waiver

MS & BP also argues that by continuing to accept late payments, Big Apple waived its right to cancel the agreements pursuant to any late payment provisions. (Compl. at ¶ 24.) Under New York law, a waiver is "the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." *Nassau Trust Co. v. Montrose Concrete Products Corp.*, 436 N.E.2d 1265, 1269–70 (N.Y. 1982). A waiver "cannot be inferred from mere silence." *Golfo v. Kycia Associates, Inc.*, 845 N.Y.S.2d 122, 124 (App. Div. 2d Dept. 2007). Such proof may come from "either an express agreement or by such conduct or a failure to act as to evince an intent not to claim the purported advantage." *Id.*

The Supply Agreement and Lease, by their terms, defeat any waiver argument. The Supply Agreement states that "[Big Apple]'s right to collect a late payment charge does not operate as a waiver against [Big Apple]'s right of termination of [the Supply Agreement] or of any other right that [Big Apple] may have at law or in equity for [MS & BP]'s failure to pay sums owed when due" and that "[n]o waiver by either party of any breach of any of the covenants or conditions herein contained to be performed by the other party shall be construed as a waiver of any succeeding breach of the same or any other covenant or condition." (Supply

---

[15] Notably, the Supply Agreement permits Big Apple to demand security in forms other than cash, including a "letter of credit, personal guaranty and/or other forms of security acceptable to seller." (Supply Agreement at ¶ 7(f).) Were the security demanded in any form other than cash, MS & BP's claim that the security was intended to immediately offset dishonored EFT transactions would not lie. Moreover, neither the supply or lease agreements, nor the PMPA, require recourse to any such offset before a franchisor may seek termination for failure to pay for rent or goods.

Agreement at ¶¶ 7(a), 19.)  The Supply Agreement also permits Big Apple to collect a service charge should any EFT transaction be rejected by MS & BP's bank for insufficient funds "in addition to any rights [Big Apple] may have under [the Supply Agreement] or the law."  (Supply Agreement at ¶ 4(b).)  Similarly, the Lease states that "[t]he failure of [Big Apple] or of [MS & BP] to insist upon performance of any of the terms or conditions of this Lease, or to exercise any right or privilege herein conferred, shall not be construed as then or thereafter waiving any such terms, conditions, rights or privileges, etc., but the same shall continue and remain in full force and effect."  (Lease at ¶ 24).  Like the Supply Agreement, the Lease also contains language permitting Big Apple to collect a service charge if MS & BP's bank rejects an EFT transaction for insufficient funds "in addition to any rights that [Big Apple] may have under this Lease or the law."  (Lease at ¶ 3(b).)  By their terms, the agreements clearly establish that acceptance of late payment or charging a fee for such was not intended to operate as a waiver of Big Apple's rights under the PMPA.  MS & BP has also not identified any express agreement indicating the voluntary and intentional abandonment of Big Apple's right to terminate.

In its memoranda before this court, MS & BP wholly fails to address the case law under the PMPA concerning waiver, instead relying on a single state-law case, which is unavailing. (*See* Affirmation in Reply to Def.'s Opp'n (Doc. No. 9) at 4–5.)  *Tri-Mar Contractors, Inc. v. ITCO Drywall, Inc.* concerned an oral contract that did not include a "no-waiver clause."  It addressed the question of whether a subcontractor could be excused from performance on the basis of the contractor's late payments where it had acquiesced to late payments throughout the course of their dealings.  74 A.D.2d 601, 601–03 (App. Div. 2d Dep't 1980).  Here, there are two written contracts containing no-waiver clauses.  Further, in light of Big Apple's imposition of remedial measures for MS & BP's repeated untimely payments, including placing MS & BP on

prepay status, imposing late fees, and demanding a security deposit, it would not be accurate to characterize Big Apple's actions as "acquiescing."[16] *See Sasafrasnet*, 689 F.3d at 693.

## V.    Cash-less Payments

MS & BP points to inconsistencies in the amount of time between when cash-less payment receipts were generated at the station and when they were subsequently credited to MS & BP's account.  This, it argues, show that Big Apple "chose to create conditions that led to [MS & BP]'s alleged breach, and [Big Apple therefore] should not be rewarded for such behavior." (Pl.'s Second Supplementary Mem. of Law at 4–6.)  Big Apple has consistently maintained, however, that Exxon/Mobil, not Big Apple or CPG, is responsible for processing MS & BP's cash-less payment receipts and transmitting payment to CPG, and that neither CPG, nor any of its affiliates, exercise any control over the processing of such sales.  (Griffith Decl. at ¶ 5; Supplemental Griffith Decl. at ¶ 4.)  Big Apple further represented that these receipts are reflected in the station's account balance as soon as they are processed and remitted to CPG by Exxon/Mobil.  (Supplemental Griffith Decl. at ¶ 5.)

But any focus on whether or not Big Apple controlled the timing of cash-less payment processing misses the point.  As noted above, both the Supply Agreement and Lease explicitly place the responsibility upon MS & BP to maintain sufficient funds in its commercial EFT account to make payments at the time of the EFT transaction.  (Supply Agreement at ¶ 4(a), (b); Lease at ¶ 3(a), (b).)  Although cash-less payment receipts were regularly credited to MS & BP's account, reducing the amount then due, nothing in the Supply Agreement or Lease prohibited

---

[16] Big Apple also argues that MS & BP has no recourse under the doctrine of promissory estoppel.  (Def.'s Supplementary Mem. of Law, at 17–18.)  Although MS & BP has not raised promissory estoppel, this doctrine too would be unavailing.  Promissory estoppel has three elements: 1) a clear and unambiguous promise; 2) a reasonable and foreseeable reliance by the party to whom the promise is made; and 3) an injury sustained by the party asserting the estoppel by reason of the reliance."  *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (quoting *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989)).  MS & BP has alleged no clear and unambiguous promise by Big Apple, and thus any argument that relies on the doctrine of promissory estoppel in this case fails at the first prong.

Big Apple from initiating the EFT transaction before the account reflected receipts up until a date certain prior to the transaction. Neither party disputes that on three occasions during the relevant period, MS & BP's account lacked the funds necessary to satisfy EFT transactions or that the transactions were for amounts legitimately owed to Big Apple at the time of initiation.

## VI.     Alleged Collusion

MS & BP further alleges that Big Apple colluded with Jane Killian, a contractor of MS & BP's, to whom it wished to award the franchise. (*See* Compl. at ¶¶ 42–48; Fadhel Alsahlan Sept. 25, 2014 Affidavit (Doc. No. 5-1 at 22) at ¶¶ 17–19.) Specifically, MS & BP alleges that Iroh instructed Killian to order no fuel over a period of seven days, providing grounds for Big Apple to terminate under 15 U.S.C. § 2802(c)(9). As Big Apple argues, this is "a red herring" of no relevance. (Def.'s Supplementary Mem. of Law at 19.) The Court agrees.

Big Apple does not seek to terminate the franchise based upon MS & BP's failure to order fuel for seven days, but based upon its failure to timely pay for fuel deliveries. MS & BP has not argued that Killian is responsible for its failure to make timely payments.[17] Instead, MS & BP dismisses the May EFT bounce as a "one-time occurrence that was . . . due to a temporary lapse with a contractor." (Fadhel Alsahlan Sept. 25, 2014 Affidavit at ¶ 12; *see also* Compl. at ¶ 41.)[18]

---

[17] At the February 3, 2015 conference, MS & BP stated that the purpose of its allegations regarding Killian was to show pretext and bad faith, not to assign responsibility for late payments to Killian.

[18] Moreover, this argument is legally irrelevant to the extent MS & BP claims that Big Apple's sought to oust MS & BP and award the franchise to Killian. Motive is irrelevant to section 2802(c) grounds. *Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 377 (4th Cir. 1992), *as amended* (July 21, 1992) ("[T]he statute provides grounds that are *per se* reasonable for terminating a franchise, provided notification requirements are met, rendering further inquiry into pretext unnecessary."); *Glenside W. Corp. v. Exxon Co., U.S.A.*, 761 F. Supp. 1100, 1109 (D.N.J. 1991) ("[A]ny ulterior motive it might have had to terminate the Franchise Agreement is irrelevant to a wrongful termination claim by a franchisee under the PMPA when, as here, the termination is made for an improper act of the franchisee."); *see also Grotemeyer v. Lake Shore Petro Corp.*, 749 F. Supp. 883, 890 (N.D. Ill. 1990).

## **CONCLUSION**

For these reasons, MS & BP has not satisfied its burden of demonstrating the existence of sufficiently serious questions going to the merits to make such questions a fair ground for litigation in this matter.  As such, MS & BP's request for a preliminary injunction is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
      May 7, 2015

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge